**TO: Clerk's Office**
     **UNITED STATES DISTRICT COURT**
     **EASTERN DISTRICT OF NEW YORK**
_____



    **APPLICATION FOR LEAVE**
  **TO FILE DOCUMENT UNDER SEAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**A) If pursuant to a prior Court Order**:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

_____
Docket Number

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**B) If a <u>new</u> application,** the statute, regulation, or other legal basis that authorizes filing under seal

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ____
Name:_____
Firm Name:_____
Address:_____
_____
Phone Number:_____
E-Mail Address:_____

_____

_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY <u>NOT</u> BE UNSEALED UNLESS ORDERED BY THE COURT.**

INDICATE UPON THE PUBLIC DOCKET SHEET: YES_____ NO_____
**If yes, state description of document to be entered on docket sheet:**

DATED:_____, NEW YORK

*Lois Bloom*   1/15/21
_____

_____

_____

**U.S. MAGISTRATE JUDGE**

_____

RECEIVED IN CLERK'S OFFICE_____
                        DATE

**<u>MANDATORY CERTIFICATION OF SERVICE</u>:**
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or **C.)** ____This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

_____       _____
    DATE                           SIGNATURE

AO  442  (Rev. 11/11)  Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| KAVEH LOTFOLAH AFRASIABI, | ) | Case No.  21-MJ-50 |
| also known as "Lotfolah Kaveh Afrasiabi," | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    KAVEH LOTFOLAH AFRASIABI,  also known as "Lotfolah Kaveh Afrasiabi" ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment        ❏ Superseding Indictment        ❏ Information        ❏ Superseding Information        ☑ Complaint
❏ Probation Violation Petition        ❏ Supervised Release Violation Petition        ❏ Violation Notice        ❏ Order of the Court

This offense is briefly described as follows:

Conspiracy to Act as an Unregistered Foreign Agent, in violation of Title 18, United States Code, Section 371; and
Acting as a Foreign Agent Without Registration, in violation of Title 22, United States Code, Sections 612 and 618(a)(1)

Date:      01/15/2021

*Lois Bloom*

*Issuing officer's signature*

City and state:     Brooklyn, New York

Hon. Lois Bloom, United States Magistrate Judge

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____ |
| _____ *Arresting officer's signature* |
| _____ *Printed name and title* |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:   KAVEH LOTFOLAH AFRASIABI

Known aliases:   Lotfolah Kaveh Afrasiabi

Last known residence:   342 Mount Auburn Street, Watertown, MA 02472

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____    Weight: _____

Sex: _____    Race: _____

Hair: _____    Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

DMP:ICR/MTK
F. #2015R01171

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

KAVEH LOTFOLAH AFRASIABI,
    also known as "Lotfolah Kaveh
    Afrasiabi,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

**COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT**

(T. 18, U.S.C., § 371; T. 22, U.S.C., §§ 612 and 618(a)(1))

Docket No. 21-MJ-50

EASTERN DISTRICT OF NEW YORK, SS:

        TYLER B. WASILITION, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

COUNT ONE
(Conspiracy to Act as an Unregistered Foreign Agent)

        In or about and between January 2007 and January 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KAVEH LOTFOLAH AFRASIABI, also known as "Lotfolah Kaveh Afrasiabi," together with others, did knowingly and willfully conspire to act and cause others to act in the United States as an agent of a foreign principal, to wit: the government of the Islamic Republic of Iran, without prior registration with the Attorney General of the United States, as required by law, contrary to Title 22, United States Code, Sections 612 and 618(a)(1).

        (Title 18, United States Code, Section 371)

## COUNT TWO
(Acting as a Foreign Agent Without Registration)

In or about and between January 2007 and January 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KAVEH LOTFOLAH AFRASIABI, also known as "Lotfolah Kaveh Afrasiabi," together with others, did knowingly and willfully act as an agent of a foreign principal, to wit: the government of the Islamic Republic of Iran, without prior registration with the Attorney General of the United States, as required by law.

(Title 22, United States Code, Sections 612 and 618(a)(1))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been a Special Agent with the FBI since 2010.  I am currently assigned to FBI Headquarters in Washington, D.C., where I supervise investigations of the activities of foreign governments and intelligence services, and related crimes, including violations of U.S. laws requiring the registration of foreign agents, and violations of U.S. sanctions.  Before my assignment to FBI Headquarters, I was assigned to the FBI's Boston Field Office, where I was responsible for conducting such investigations.

2.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from both government and public records databases, information obtained from other agents, and review of records and documents.

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

When I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.   In addition, many of the statements described herein are based on draft English translations of communications that were not originally made in English, and are subject to revision.

I.      The Defendant and Relevant Entities

        3.      The defendant KAVEH LOTFOLAH AFRASIABI, also known as "Lotfolah Kaveh Afrasiabi" (the "defendant" or "AFRASIABI"), is a citizen of the Islamic Republic of Iran and a Lawful Permanent Resident of the United States who resides in Watertown, Massachusetts.   AFRASIABI was born in Iran in 1957, and entered the United States in 1973.   He became a Lawful Permanent Resident on or about February 16, 1984.

        4.      AFRASIABI received his undergraduate degrees from the University of Massachusetts in 1980, and a master's and doctorate degrees from Boston University in 1988. Following his arrival in the United States, AFRASIABI was employed by several U.S. universities.   However, as discussed more fully below, since in or about 2007, AFRASIABI has surreptitiously derived a significant portion of his income from compensation for services performed at the direction and under the control of the Government of the Islamic Republic of Iran ("GOI") and officials of the GOI assigned to the Permanent Mission of the Islamic Republic of Iran to the United Nations ("IMUN") in New York City.   In performing these services, AFRASIABI has not registered with the U.S. Department of Justice as an agent of a foreign principal, the GOI.

        5.      The GOI is not recognized by and does not have diplomatic relations with the United States.   The GOI is, however, recognized by other foreign governments and is a member of the United Nations.

6.    The GOI's Ministry of Foreign Affairs operates two entities within the United States, the Iranian Interests Section, based out of the Embassy of Pakistan in Washington, D.C., and the IMUN in New York City.   The GOI maintains the Iranian Interests Section in the Pakistani Embassy for the purpose of handling visas and other consular affairs. The IMUN is the only official diplomatic entity representing the GOI within the United States, and it is staffed with officials from its foreign ministry seeking to conduct foreign affairs and promote the GOI's national interest.

II.    The Foreign Agents Registration Act

7.    The Foreign Agents Registration Act ("FARA") requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts and disbursements in support of those activities.   Disclosure of the required information facilitates evaluation by the U.S. government and the public of the statements and activities of such persons in light of their function as foreign agents.

8.    As relevant here, under FARA, a person acts as an agent of a foreign principal when he acts "as an agent, representative, employee, or servant, or . . . in any other capacity at the order, request, or under the direction or control, of a foreign principal," to, among other things, engage within the United States in "political activities" for or in the interests of such foreign principal, or to act within the United States as a "public relations counsel," "publicity agent," or "political consultant" for or in the interests of such foreign principal.   See 22 U.S.C. § 611(c)(1).

9.    FARA defines the terms "political activities," "public relations counsel," "publicity agent," and "political consultant," as follows:

a.      "Political activities" means "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."   22 U.S.C. § 611(o).

b.      "Public-Relations counsel" includes "any person who engages directly or indirectly in informing, advising, or in any way representing a principal in any public relations matter pertaining to political or public interests, policies, or relations of such principal."   22 U.S.C. § 611(g).

c.      "Publicity Agent" includes "any person who engages directly or indirectly in the publication or dissemination of oral, visual, graphic, written, or pictorial information or matter of any kind, including publication by means of advertising, books, periodicals, newspapers, lectures, broadcasts, motion pictures, or otherwise."   22 U.S.C. § 611(h).

d.      "Political consultant" means "any person who engages in informing or advising any other person with reference to the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party."   22 U.S.C. § 611(p).

10.      Thus, for example, a person who engages in lobbying, political activities or public relations work in the United States for a foreign principal, or advises a foreign principal regarding U.S. foreign policy or the relations between a foreign government and the United States, is required to provide a detailed registration statement to the United States

Department of Justice.   The filing, made under oath, must disclose the name of the foreign principal, payments made to the person by the foreign principal, and measures undertaken for the foreign principal, among other information.   The purpose of FARA is to prevent covert influence in the United States by foreign principals.   Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals.

11.     A willful violation of FARA is punishable under Title 22, United States Code, Section 618(a).   FARA also provides for civil remedies pursuant to Title 22, United States Code, Section 618(f).

12.     The GOI is a foreign principal under FARA.   See 22 U.S.C. § 611(b)(1).

III.    The Defendant's Political Activities at the Direction and Under the Control of the GOI

13.     KAVEH AFRASIABI is an employee of the IMUN who is paid, directed and controlled by the GOI to lobby U.S. government officials, conduct public relations for the GOI, consult GOI officials on U.S. policy, and create and disseminate information publicity favorable to the GOI in the U.S. and abroad.   In the course of this employment, AFRASIABI has, among other things, (1) lobbied a U.S. Congressman to advocate for policies favorable to the GOI within the U.S. Government, (2) counseled GOI diplomats concerning U.S. foreign policy, (3) made television appearances to advocate for the GOI's views on world events, and (4) authored articles and opinion pieces espousing the GOI's position on various matters of foreign policy, all pursuant to his employment by the GOI, and at the direction and under the control of the GOI.

14.     AFRASIABI has received direction from GOI officials, including, but not limited to, two IMUN press secretaries (hereinafter "Press Secretary-1" and "Press Secretary-2").   However, in all these activities, AFRASIABI has not disclosed to the U.S. Department of Justice, other U.S. officials or the public that he is working at the direction and under the control of GOI officials or that he is compensated by the GOI, and he has not registered as the agent of a foreign principal as required by FARA.

15.     As discussed more fully below, AFRASIABI has received payments and health care benefits as part of his compensation for his employment with the IMUN.

A.     The Defendant Lobbied U.S. Government Officials for the GOI

16.     AFRASIABI lobbied U.S. government officials by offering his services as a purported independent expert on, among other things, GOI nuclear policy.   During his interactions with these U.S. officials, AFRASIABI did not identify himself as an agent of the GOI.

17.     In or about December 2009, AFRASIABI assisted a U.S. Congressman ("Congressman-1") with the drafting of a December 18, 2009 letter that Congressman-1 sent to the President of the United States with a proposal related to the U.S.-GOI nuclear negotiations.   The letter contained a proposal centered, in part, on the acceptance of a nuclear fuel swap agreement that had been proposed by the GOI.   The letter from Congressman-1 to the President stated, in part, that AFRASIABI had advised Congressman-1 on the proposal. AFRASIABI was identified in the letter as "a former professor at Tehran University and a former advisor to the Iranian nuclear negotiation team."   At no point was AFRASIABI identified as an employee of the IMUN or an agent of the GOI.

18.     On or about June 16, 2010, AFRASIABI emailed a GOI official with the diplomatic rank of IMUN Counselor (the "IMUN Counselor") and discussed a potential U.S.-GOI nuclear deal that, at the time, had been proposed by Iran.   In that email to the IMUN Counselor, AFRASIABI stated, in part, "I am clear about lobbying us for swap deal but may cause misunderstandings and backfire in our environment."[2]

19.     Thereafter, on or about June 25, 2010, AFRASIABI emailed a senior U.S. State Department official the following:

> Hello.   Per the suggestion of [U.S. Person-1][3] I am writing this letter to contact you regarding the Iran nuclear issue.   As an expert on the subject, who has repeatedly in oped articles including in Washington Times urged the White House to consent to the nuclear swap deal, I am interested to know the administration's latest thinking on the pending matter?

At no point during his correspondence with the State Department official did AFRASIABI identify himself as an employee of the IMUN or an agent of the GOI.

20.     Approximately two years later, on or about May 25, 2012, AFRASIABI exchanged multiple emails with a staff member from Congressman-1's office ("Staff Member-1"), concerning a copy of the December 18, 2009 letter that Congressman-1 had sent to the President of the United States with a proposal related to the U.S.-GOI nuclear negotiations.

---

[2]     Except where otherwise indicated, the communications quoted herein have not been altered from their original form.   Excerpts and summaries of communications may be drawn from draft and summary translations from Farsi to English that are subject to revision.

[3]     U.S. Person-1 was a former senior U.S. State Department official who served in the State Department's Bureau of Near Eastern Affairs.

21.     Later that day, Staff Member-1 informed AFRASIABI that Congressman-1 wished to speak with AFRASIABI on the telephone regarding the letter and requested AFRASIABI's phone number.

22.     On or about May 30, 2012, AFRASIABI was advised by Staff Member-1 that AFRASIABI's telephone number had been passed to Congressman-1.  Later that day, AFRASIABI emailed Staff Member-1 and offered to brief Congressman-1 on the state of the U.S.-GOI nuclear negotiations.   AFRASIABI also attached a hyperlink to an article that he had recently co-authored in the New York Times titled, "Critical Threshold in the Iran Crisis." In that article, AFRASIABI argued that the U.S. sanctions on Iran acted as a major stumbling block in nuclear negotiations "since Iranian negotiators need[ed] to produce a tangible trade-off between any concessions and a recognition of Iran's right to legitimate [nuclear] enrichment."

23.     On or about June 5, 2012, AFRASIABI emailed Staff Member-1.   In that email, AFRASIABI expressed dismay that he had not yet been contacted by Congressman-1.   AFRASIABI stated:

> Hi [Staff Member-1], I have not heard from the Congressman. I am an Iran expert and with high visibility -- as can be seen in below samples of my interviews on NPR, Christian Science Monitor, Al-Jazeera, Agence France, oped in NYTimes, and feel a little disrespected here since my small request for a copy of the letter has been ignored.

AFRASIABI then provided links to various articles that he had written and television interviews that he had given related to the U.S.-GOI nuclear negotiations.

24.     On or about June 6, 2012, another staff member to Congressman-1, who served as Congressman-1's legislative director ("Staff Member-2"), emailed a copy of the December 18, 2009 letter to AFRASIABI.

25.     On or about June 6, 2012, AFRASIABI emailed Staff Member-2 and thanked her for the copy of the letter.  AFRASIABI stated, in sum and substance, that Congressman-1 had instructed AFRASIABI to speak to Staff Member-2 about the possibility of AFRASIABI organizing a panel of experts regarding U.S.-GOI relations in July 2012. Staff Member-2 replied, in sum and substance, that she would need to secure a room for such a panel.  AFRASIABI responded, "Great."  Correspondence between AFRASIABI and Congressman-1's staff indicate that the proposed panel did not ultimately take place.

26.     Although AFRASIABI was not successful in persuading Congressman-1 to schedule a panel on Iran, he used his access to Congressman-1 and Congressman-1's staff to send articles AFRASIABI had written as a purported expert on the subject for the purpose of lobbying Congressman-1.

27.     For example, on or about June 8, 2012, AFRASIABI emailed Staff Member-2.   In that email, AFRASIABI included a link to an interview that AFRASIABI had conducted for the Asia Times with the GOI's Ambassador to the International Atomic Energy Agency.   During this interview, the GOI's Ambassador discussed, among other things, a meeting in which representatives of the Non-Aligned Movement[4] expressed support for the GOI's nuclear rights.

---

[4]     The Non-Aligned Movement is a forum of approximately 120 developing world states that are not formally aligned with or against any major superpower or power bloc.

28.     On or about June 17, 2012, AFRASIABI emailed Staff Member-2 and stated, "hi if possible please show this wire report that quotes me on nuclear talks to the Congressman, thanks."   AFRASIABI included a link to the wire report.

29.     On or about July 3, 2012, AFRASIABI emailed Staff Member-2 and attached an article that he had written for the Asia Times titled, "Why Iran Does Not Want The Bomb."   In the article, AFRASIABI set forth and analyzed numerous reasons for the GOI's push for nuclear energy that did not relate to the development of nuclear weapons.   In the article, AFRASIABI did not disclose that he was an agent of the GOI or an employee of the IMUN.

30.     On or about July 16, 2012, AFRASIABI emailed Staff Member-1 at Congressman-1's office.   In that email, AFRASIABI included a link to an article that he had written for the Al-Monitor publication in which he discussed the GOI's nuclear energy program.   In the article, AFRASIABI once again set forth and analyzed numerous reasons for the GOI's push for nuclear energy that did not relate to the development of nuclear weapons. AFRASIABI requested that Staff Member-1 bring the article to Congressman-1's attention.

31.     On or about August 1, 2012, AFRASIABI emailed Staff Member-2.   In his email, AFRASIABI included a link to an article that he had written for the website "campaigniran.org."   This website advocates for, among other things, the removal of all sanctions against the GOI.   The article discussed the July 18, 2012 bus bombing in Bulgaria that killed numerous Israeli citizens.   Israel subsequently attributed the attack to Iran or its proxy, Hezbollah.   In the article, AFRASIABI argued that the attack was a "false flag" operation that was staged by Israel.   AFRASIABI requested that Staff Member-2 bring the article to Congressman-1's attention.

32.     Finally, on or about August 23, 2012, AFRASIABI emailed Staff Member-2.   In his email, AFRASIABI included a link to an article that he had written for the New York Times titled, "Gathering Hope In Tehran."   The article discussed the Non-Aligned Movement's summit that was to be held in Tehran the following week.   In the article, AFRASIABI praised the GOI's leadership of the Non-Aligned Movement and criticized the negative approach taken by the United States to the summit.   AFRASIABI requested that Staff Member-2 bring the article to Congressman-1's attention.

33.     At no time during his correspondence with Staff Member-1 and Staff Member-2 did AFRASIABI identify himself as an employee of the IMUN or an agent of the GOI.

34.     On or about November 14, 2012, AFRASIABI emailed the IMUN Counselor and stated:

> Vahid jaan salam you saw [Congressman-1's] letter praising me and also so many track ii meetings in the past i ve done my fair share of advising but us government is in the palms of zionists so i focus on how we can best fight back.

B.     The Defendant Acted as a Political Consultant and Publicity Agent for the GOI

35.     Throughout his employment at the IMUN, at the direction and under the control of the GOI, AFRASIABI has provided political advice and counsel to GOI officials at the IMUN on various matters of U.S.-GOI relations.   AFRASIABI also sought approval, direction and guidance from the IMUN in publishing articles and books and conducting televised interviews in which he advocated for positions, policies and perspectives favored by the GOI.

1.  U.S. Criticism of GOI Influence in Bahrain

36.     In or about March 2011, Bahraini security forces arrested Iranian-backed Shiite anti-government protesters.   At the request of the Bahraini monarchy, Saudi Arabian troops entered Bahrain to provide assistance.   At the time, the U.S. government expressed concern that the GOI was attempting to exploit the volatile situation in Bahrain to further its influence in the region.   On or about April 12, 2011, the IMUN Counselor emailed AFRASIABI seeking advice regarding U.S-GOI relations in Bahrain.   Specifically, the IMUN Counselor inquired, "what can we do in regards to Bahrain?   any idea, any conference?"   Later that day, AFRASIABI responded to the IMUN Counselor and, referring to a person believed to be a senior official of the GOI who was at the time the GOI's Chief Nuclear Negotiator and the Secretary of the GOI's Supreme National Security Council (the "Senior GOI Official-1"), stated, "Salam, I think we should send [Senior GOI Official-1] to EU to push [the EU Foreign Policy Advisor] to impose penalties on Bahrain and to call for the withdrawal of Saudis and UAE."

37.     In a second email to the IMUN Counselor on or about April 12, 2011, AFRASIABI stated the following:

> I think indirectly we should lobby washington to lean on saudis
> and bahrainis to go easy on the shiites and to continue to network
> with our allies at the un perhaps to have a special envoy on
> bahrain Other than that the one day conference [U.S. Person-4]
> and I are planning could be a good complement.

38.     Also on April 12, 2011, IMUN Press Secretary-1 emailed AFRASIABI and inquired, "what we can do on bahrain?   You know that   situation is very trategic?   Can we talk to publish some article on that?"   AFRASIABI replied to Press Secretary-1 and stated,

"On Bahrain we should get on the nerves of Europeans and urge them to impose sanctions, asset freeze and travel ban and to condemn saudi intervention, and to call for orderly political modernization."

39.    On or about April 29, 2011, AFRASIABI co-authored an article that appeared in The Guardian newspaper titled, "The West's Silence over Bahrain Smacks of Double Standards."  In the article, AFRASIABI praised the EU Foreign Policy Advisor for "wisely insulat[ing] themselves from the Saudi-Bahraini PR campaign to rationalise Bahrain's repressive behavior by scapegoating Iran."  Conversely, AFRASIABI criticized the United States for its accusations of GOI meddling.   AFRASIABI also wrote that:

> A more politically and strategically correct approach counsels a course of action along the following lines: strong and sustained condemnation of the Bahraini government for its human rights abuses; threat of diplomatic reprisals; warning to freeze Bahraini assets and impose travel bans on various Bahraini officials implicated in rights violations; calling on Saudi Arabia to respect the democratic aspirations of Bahraini people and to withdraw its military forces from Bahrain; offering to mediate in the Bahrain political crisis; and to facilitate the process toward free elections.

As discussed above, on or about April 12, 2011, Press Secretary-1 directed AFRASIABI to publish an article advocating for these courses of action in Bahrain.

2.   U.S-GOI Nuclear Negotiations

40.    On or about January 23, 2013, AFRASIABI emailed IMUN Press Secretary-1 and advised about a potential opportunity to publish an article in the Bulletin of Atomic Scientists.   On or about January 25, 2013, Press Secretary-1 informed AFRASIABI that either he or Iran's Deputy Ambassador to the United Nations (the "Deputy Ambassador")

could provide assistance to AFRASIABI in relation to the proposed article.   In a subsequent email, AFRASIABI advised that "they want to know what iran s' position is to end the crisis."

41.    On or about February 19, 2013, AFRASIABI sent a copy of an unpublished draft version of the article to the Deputy Ambassador and stated, "please check the attached article.   I will appreciate any input.   It has been accepted and gone through revisions.   It is in line with leader's latest speech."

42.    On or about February 21, 2013, the Deputy Ambassador replied to AFRASIABI's email attaching the article and stated, "the below issues are dangerous and are contrary to our national positions and actions."   The Deputy Ambassador then listed four points that AFRASIABI should remove from the article.   Per the Deputy Ambassador's request, AFRASIABI modified the article and sent a revised version to the Bulletin of Atomic Scientists.   On or about February 25, 2013, AFRASIABI forwarded a link to this revised article to the Deputy Ambassador and stated, "salam here is the article, thank you again, I got rid of all those points you raised."

43.    Throughout his correspondence with the Bulletin of Atomic Scientists, AFRASIABI described himself as a former political science professor at Tehran University, a former advisor to Iran's nuclear negotiation team, and an author of many books on Iranian foreign policy.   However, in an email on February 19, 2013, AFRASIABI requested that the Bulletin delete the reference to his advisory role to the Iranian negotiation team.   On or about February 25, 2013, the revised, GOI-approved article appeared in the Bulletin of Atomic Scientists.   In the article, AFRASIABI did not disclose that he was an agent of the GOI or an employee of the IMUN.

44.     On or about March 24, 2014, AFRASIABI emailed IMUN Press Secretary-2 and relayed his concern with the state of the nuclear negotiations and advised that "we re losing some of the public diplomacy gains of recent months the enemy takes advantage of our long holiday."   Press Secretary-2 responded, "Ok.   We have vienna 3 on April 7, it's good if you write an article based on these stuff refuting allegations which mainly aim at deviating attention from reaching a comprehensive agreement."   AFRASIABI subsequently replied, "Problem is outlet in us we can try al monitor but it has very limited reach."   Later that day, AFRASIABI again replied to Press Secretary-2, attached an article that he had previously authored for the Iran Review regarding the nuclear negotiations with the United States, and advised, "I put a postscript on this article to enhance our line."    The Iran Review is a website that describes itself as the "leading, non-governmental and non-partisan website – organization representing scientific and professional approaches towards Iran's political, economic, social, religious and cultural affairs, its foreign policy, and regional and international issues within the framework of analysis and articles."

45.     On or about May 2, 2014, AFRASIABI emailed IMUN Press Secretary-2 and requested that Press Secretary-2 forward a letter to Iran's Permanent Representative to the United Nations ("Permanent Representative-1").   The letter requested that Permanent Representative-1 set up a meeting for AFRASIABI with a senior member of Iran's nuclear negotiating team.   AFRASIABI explained to Permanent Representative-1 that he was writing a book "to present the Iranian point of view on the nuclear issue."   AFRASIABI further opined to Permanent Representative-1 that "given the importance of public diplomacy and our efforts as Iran experts, it is important to occasionally have unique access to policy makers that would give us an advantage."

46.     Following the May 2, 2014 letter, AFRASIABI, in a written communication, also requested that Press Secretary-2 schedule a meeting with Permanent Representative-1 to discuss the issues set forth in the letter.   A meeting between AFRASIABI and Permanent Representative-1 was subsequently scheduled for the following week.

47.     On or about June 25, 2014, AFRASIABI emailed Press Secretary-2 and provided a link to a New York Times article of the same day discussing Iran's nuclear program. AFRASIABI stated, "This article IS VERY MISLEADING. It claims the 2007 IAEA workplan was never implemented when actually it was and IAEA in Feb 2008 report admitted it. Do you want javab?"   The term "javab" in the Farsi language means, in sum and substance, "response."

48.     Later that day, Press Secretary-2 replied to AFRASIABI and stated the following:

> salam.   sorry I was in a meeting. we discussed it in detail this morning. yes we can write something as a reply.   you can include the followings:   old senario and openning up outdated files can not change our position or add anything new to existing arguments that Iranophobia is obsolete.   Iranian advancement in securing peaceful nuclear activities is the result of endeavors of talented and patriotic young scientists whose aspiration for making Iran independent will not fade.   naming one or two individuals is regarded as weakness and unsubstantive claims which will not secure a win-win situation for both parties of the conflict.

3.   The Pan-American Flight 103 Documentary

49.     In addition to his published articles at the direction and under the control of the GOI, AFRASIABI often obtained guidance and direction from IMUN diplomats prior to conducting televised media appearances on Press TV and other media outlets.   Press TV is

an English-language news and documentary network controlled and owned by the Islamic Republic of Iran Broadcasting Organization which is an agency of the GOI.

50.    For example, in early 2014, Al Jazeera TV broadcasted a special documentary on the December 21, 1988 bombing of Pan-American Flight 103 over Lockerbie, Scotland.   The program, in part, attributed the bombing to the GOI.   On or about March 11, 2014, IMUN Press Secretary-2 called AFRASIABI and discussed the Al Jazeera program and the responsibility it placed on the GOI for the bombing.   AFRASIABI informed Press Secretary-2 that he was invited to appear on Al Jazeera TV for an interview regarding the program.   Throughout the call, Press Secretary-2 advised AFRASIABI on what to say during the interview and instructed him to state that his views on the issue were as an independent expert, and were not the GOI's.

51.    During the March 11, 2014 call, Press Secretary-2 instructed AFRASIABI, in sum and substance, to explain that both the United States and Great Britain completed their investigations and presented their findings and that these new filmmakers are questioning those findings many years later.   That night, AFRASIABI appeared on Al Jazeera and gave an interview in which he refuted the premise of the program and conveyed the messages that Press Secretary-2 had directed him to convey.   Prior to the interview, AFRASIABI spoke with a representative from Al Jazeera and stated, in sum and substance, that he not be portrayed as a representative of the GOI, but rather as an individual with a close relationship to GOI officials.

52.    The next day, Press Secretary-2 called AFRASIABI and again discussed the Pan-American Flight 103 program.   AFRASIABI expressed the opinion, in sum and substance, that the program was a sham supported by England to attack the GOI.   He also

noted that the FBI agent interviewed for the show rejected the notion that the GOI was involved.   Finally, AFRASIABI stated that the GOI should sue Al Jazeera, in a similar manner to how General William Westmoreland sued CBS, Inc. in 1982 claiming that a documentary broadcast by the network included defamatory statements about General Westmoreland that were made with actual malice.   Press Secretary-2 instructed AFRASIABI to email him the FBI agent's statement on the bombing as well as the rationale for Al Jazeera to be sued.   Press Secretary-2 also stated that he would send AFRASIABI an article refuting the Al Jazeera claims and asked AFRASIABI to send the article to his contact at Al Jazeera.   In a subsequent email, Press-Secretary-2 asked AFRASIABI to request Al Jazeera to post the article on its website.

53.    Later that day, AFRASIABI emailed Press Secretary-2 several lines from the FBI agent's interview and the rationale behind bringing a lawsuit against Al Jazeera. Specifically, AFRASIABI stated, in sum and substance, that the GOI should make a "serious threat of a 500 million dollar lawsuit against AlJazeera.   This would act as a brake on their current plan and might put a stop.   Soft diplomacy does not answer this specific situation." AFRASIABI also emailed the article provided by Press Secretary-2 to two of his contacts at Al  Jazeera.     AFRASIABI  blind  carbon  copied  Press  Secreaery-2 on  both  emails. AFRASIABI later reported back to Press Secretary-2 that Al Jazeera was not interested in posting the article on its website.

54.    On or about March 13, 2014, Press Secretary-2 emailed AFRASIABI and again sought AFRASIABI's counsel on the Pan-American Flight 103 issue.   AFRASIABI again reiterated the need to threaten a lawsuit.   Thereafter, Press Secretary-2 recommended that the IMUN consult with an attorney.   The next day, AFRASIABI published an article on

the Iran Review website titled "The Case for a Lawsuit Against Al Jazeera."   AFRASIABI emailed Press Secretary-2 and stated "See iran review Please post this on mission s website section on opinion."[5]   Press Secretary-2 replied to AFRASIABI by sending a link to an article on Press TV.   AFRASIABI replied, "Good double punch."

### 4.   The Iranian Capture of Ten American Sailors

55.   On or about June 30, 2016, AFRASIABI spoke to IMUN Press Secretary-2 about, among other things, AFRASIABI's upcoming television interview on Russia Today International (hereinafter, "RT"), an English language broadcast accessible in the U.S. During this conversation, AFRASIABI and Press Secretary-2 discussed how AFRASIABI should respond to questions relating to the GOI's January 12, 2016 gunpoint-capture of ten U.S. Navy sailors in the Persian Gulf.

56.   Press Secretary-2 directed AFRASIABI to communicate, in sum and substance, the following talking points: (a) Iran provided the sailors with food, water and proper shelter; (b) the sailors left Iran happy and healthy; and (c) the sailors were only held for sixteen hours.

57.   On or about July 10, 2016, AFRASIABI appeared on RT television to discuss Iran's January capture of the United States Navy personnel.   During the interview, AFRASIABI stated, in sum and substance, that (a) the sailors were treated well; (b) they

---

[5]      The Iran Review is an English-language website based in Iran that describes itself as "the leading independent, non-governmental and non-partisan website – organization representing scientific and professional approaches towards Iran's political, economic, social, religious, and cultural affairs, its foreign policy, and regional and international issues within the framework of analysis and articles," and states that it "[p]romotes dialogue and debate and offers a spectrum of ideas from scholars with expert knowledge."

laughed and left with big smiles on their faces; and (c) they were only held for sixteen hours. AFRASIABI did not disclose that he was an agent of the GOI at any point in the interview.

    5.  <u>GOI-Pakistani Relations</u>

    58.    On or about March 28, 2014, AFRASIABI sent a message to IMUN Press Secretary-1 that stated: "Salam. I m on ptv at 915 on pakistan."   The following exchange then occurred:

| | |
|---|---|
| PRESS SECRETARY-1: | Good luck |
| AFRASIABI: | Merci don t have any insight really not my area pf focus |
| | Can y give me a couple of points ease |
| PRESS SECRETARY-1: | Emphasis on: Yesterday meeting bet teo president i kabul on the guardsman |
| | Gas pipeline and the need for pak to show concrete will |
| AFRASIABI: | Ok thanks anything else on who s behing jeish |
| PRESS SECRETARY-1: | What their spokesmam said that we operate inside iran and hostages are inside iran is sheer lies and nonsense |

    59.    Press Secretary-1's text message "Emphasis on: Yesterday meeting bet teo president i kabul on the guardsman" appeared to be a reference to a gathering of Eurasian leaders in Kabul, Afghanistan to mark the New Year on the Persian calendar.   Leaders in attendance at this event included, among others, the President of the GOI and the President of Pakistan.   Based on news reporting and other sources, the GOI President called for increased joint action by Iran, Pakistan, Tajikistan and Afghanistan in the fight against terrorism and extremism.   The President of the GOI stated that he relayed this concern to the Prime Minister of Pakistan in a previous telephone call earlier in the week.

60.     On or about March 30, 2014, AFRASIABI appeared on Press TV and at the direction of Press Secretary-1 discussed, among other things, that members of the GOI's Islamic Revolutionary Guard Corps who were being held hostage along the Pakistani border by an alleged terrorist group.   AFRASIABI, stated, in sum and substance, that Iranian president Rouhani was in Kabul discussing the need for joint action along the Iran-Pakistan border.   AFRASIABI also stated, in substance, that it was incumbent on the Pakistani government to do more to secure the border.

6.     The Defendant's More Recent Efforts to Influence U.S. Public Opinion for the Benefit of the GOI

61.     AFRASIABI continues to publish articles and books and make appearances on broadcast television programs to influence U.S. public opinion on behalf of the GOI.

62.     For example, on or about May 16, 2019, AFRASIABI authored an article for the Eurasia Review titled, "Trump's Iran War, The Japan Analogy."   Prior to that article, AFRASIABI had authored articles on May 2, 2019 ("Debunking the Harvard Report on Iran Nuclear Past"), February 18, 2019 ("Zarif's Twitter Diplomacy and the Failed Warsaw Summit") and February 10, 2019 ("Iran's 'Heroic' Revolution at 40").

63.     On or about July 9, 2019, AFRASIABI published an article on the website "LobeLog.com" titled "UK's Misguided Bandwagoning with U.S. on Iran."   The article discussed the United Kingdom's seizure of an Iranian oil tanker off the coast of Gibraltar in early July 2019.   In the article, AFRASIABI warned that the United Kingdom's deference to the United States "bullying" of Iran could provide for a serious crisis in relations between Iran and the United Kingdom.

64.     On or about September 18, 2019, AFRASIABI was interviewed as part of an article in National Public Radio ("NPR") that discussed the recent attack on oil facilities in Saudi Arabia.   AFRASIABI stated that "basically Iran's back is against the wall with the economic warfare waged by the U.S. and its regional allies wreaking havoc on the Iranian economy."   AFRASIABI was identified in the article as an Iranian-American political scientist.

65.     On or about January 3, 2020, AFRASIABI appeared as a guest commentator on CGTN America, an English-language television news program targeted at a U.S. audience.   During the appearance, AFRASIABI was identified by the host of the program as a "political scientist and as the author of the book 'Trump and Iran: From Containment to Confrontation,'" and later in an on-screen graphic as an "Author, political scientist and Iranian affairs analyst," who had "Served as an adviser to Iran's nuclear negotiation team," and who "Has taught at Tehran and Boston Universities."

66.     During his January 3, 2020 appearance, AFRASIABI provided commentary on the U.S. military airstrike that killed Major General Qasem Soleimani, the head of the Quds Force, the external operations arm of the GOI's Islamic Revolutionary Guard Corps, a designated foreign terrorist organization.[6]   Among other things, AFRASIABI stated that President Donald J. Trump's "hands are stained with the blood of ten martyrs, five from Iran, five from Iraq," described the attack as an "unprovoked crime by the United States,"

---

[6]     See Statement by the Department of Defense, U.S. Dep't of Defense (Jan. 2, 2020), https://www.defense.gov/Newsroom/Releases/Release/Article/2049534/statement-by-the-department-of-defense.

asserted that the President "has provoked . . . blowback . . . that will be coming before too long," and stated that Soleimani had been "murdered in cold blood."

67.     After the host of the program turned to another guest and stated that there was "no doubt in the West that Soleimani was not exactly an angel, this is a bad person, he is responsible for the deaths of thousands of people, Americans, Syrians, Iraqis, as well as Iranians," and then asked the guest a question about U.S. strategy, AFRASIABI interrupted the guest's response to accuse the host of bias.  Though he himself had not disclosed his ongoing employments by the GOI during the program, AFRASIABI stated "I find that so offensive.   You [are] supposed to be [a] neutral anchor person and you belittle a national hero like that, I'm going to walk out of your goddamn program.   This [is] offensive to the Iranians that you belittle a national hero like this."   AFRASIABI did not walk off the set.

68.     Later in the program, the host asked AFRASIABI to comment on what kind of response could be expected from Iran.   Instead of answering the question, AFRASIABI changed the subject, arguing that Soleimani was a national hero "revered" in Iran for serving as a "bulwark against terrorism," particularly for fighting against the Islamic State of Iraq and al-Sham ("ISIS"), which is also a designated foreign terrorist organization, and claimed that but for Soleimani, ISIS would still control territory in Iraq.   AFRASIABI further claimed that Soleimani had collaborated with American forces to fight against ISIS in Mosul, Iraq.

69.     Subsequently, on or about January 5, 2020, AFRASIABI emailed GOI officials, including the Foreign Minister and the GOI's Permanent Representative to the United Nations ("Permanent Representative-3") with advice for the GOI's "retaliation" for the killing of Soleimani, writing:

Ba salam, as a foreign policy expert, I advise the government not to pull out of barjam[7] and yet end all inspections and end all information on Iran's nuclear activities pending a UNSC [8] condemnation of US' illegal crime.  The advantages are as follows:

1. it will strike fear in the heart of enemy

2. it will weaken Trump and strengthen his opponents

3. it shows Iran's rule abiding behavior and puts pressure on UN and Europe to act.

4. It is an important retaliation and will be well received by people.

70.     In a later email to Permanent Representative-3 on or about January 7, 2020, AFRASIABI advised that "we shoukd show heroic restraint," and in an apparent reference to the United States, AFRASIABI continued "[e]nemy has laid trap for a war we must avoid."

C.     The Defendant Edited Articles and Speeches Directed to the U.S. Public for Other Senior GOI Officials

71.     AFRASIABI also edited articles and speeches for senior leaders in the GOI outside of IMUN, including the President and Foreign Minister of the GOI.  Many of these articles and speeches were directed to a U.S.-based audience.

72.     For example, on or about September 16, 2015, and September 17, 2015, AFRASIABI and IMUN Press Secretary-1 exchanged numerous emails in which Press Secretary-1 directed AFRIASABI to edit a draft speech that was to be delivered by the President of the GOI at the United Nations on September 24, 2015.  Press Secretary-1 directed

---

[7]     Based on my training and experience, I am aware that "Barjam" is the Iranian name for the July 2015 agreement on Iran's nuclear program between the GOI, the United States and several other nations known as the Joint Comprehensive Plan of Action ("JCPOA").

[8]     Based on my training and experience, I believe that UNSC is a reference to the United Nations Security Council.

AFRASIABI to "not show or send for anyone else."   On September 16, 2015, AFRASIABI

informed Press Secretary-1 that the speech

> needs some punch lines to be more effective.  I suggest: the
> antidote to extremism is respect and tolerance of others
> there is a chasm between rhetoric and action of some
> governments against the scourge of extremism
> The culture of extremism can only be eradicated by reverence
> for moderation.

73.    Thereafter, on or about September 20, 2015, AFRASIABI subsequently

emailed U.S. Person-2 and stated, "Between us I previewed one of his speeches added few

punch lines we shall see."

74.    Additionally, on or about April 11, 2015, Press Secretary-1 emailed

AFRASIABI and stated, "I am writing a draft oped for WP.  If you can help me much

appreciate . . . ."   In a subsequent email, Press Secretary-1 wrote, "I am writing in Persian and

English.   It is for [the Foreign Minister].   I send you the first draft and related materials in 30

min."   Shortly thereafter, Press Secretary-1 emailed AFRASIABI a draft of an op-ed

discussing, among other things, Iran's nuclear program and regional cooperation amongst the

Persian Gulf states.   In reply, AFRASIABI stated, "readers might like to know that [President]

Rouhani is the architecture of a low security cooperation agreement with Saudi Arabia."

Later that day, Press Secretary-1 emailed AFRASIABI, "I sent it.  Thank you. good piece."

On or about April 20, 2015, the op-ed appeared in the New York Times under the name of the

GOI's Foreign Minister.

75.    On or about October 9, 2015, AFRASIABI made explicit his role as a

political consultant to the GOI in an email he sent to the Foreign Minister with the subject line

"my advisory role," in which he proposed to expand his services to the GOI.   In the email,

AFRASIABI wrote "basalamplease consider  a more robust role for me given my credential and name recognition in iran as a stubborn defender of iran who has experienced years of oppression in us."   The Foreign Minister responded by thanking AFRASIABI for his offer.

D.    The Defendant Is a Paid Employee of the IMUN

76.    AFRASIABI's activity for the GOI has been directly supported by financial assistance from the IMUN as part of, what AFRASIABI recently described in July 2020, as a "very productive relationship" that has "span[ed] decades."   Indeed, AFRASIABI receives "salary" checks from IMUN's official bank account in Queens, New York, and healthcare benefits available only to IMUN employees through the IMUN's employee health benefit plan.   When this relationship has been periodically reviewed by GOI officials, AFRASIABI has cited the steady flow of books, articles and television appearances in which he advocates for policies and perspectives favored by the GOI as justification for his continued employment.

1.    AFRASIABI's Compensation and IMUN Employee Health Benefits

77.    AFRASIABI receives regular payments from the IMUN in compensation for his work on behalf of the GOI.   According to financial records, between in or about July 2007 and November 2020, AFRASIABI received more than $265,000 from the IMUN in checks payable to him and drawn on official bank accounts held in the name of the Permanent Mission of the Islamic Republic of Iran to the United Nations.   The memo lines of many of the most recently issued checks have explicitly described the payments as "salary."

78.    Many of the payments made to AFRASIABI by officials of the GOI assigned to the IMUN since 2012 have been drawn on the IMUN's bank account at a financial institution in Long Island City in Queens, New York.   For example, on or about November

17, 2020, AFRASIABI negotiated a check in the amount of $3,000 issued to him by an official

of the GOI assigned to the IMUN, as compensation for AFRASIABI's actions as an agent of

the GOI.   The check was drawn on the bank account of the "PERMANENT MISSION OF

I.R. IRAN TO THE UN" at a financial institution located in the Long Island City neighborhood

of Queens, New York.

79.    In addition to the salary paid to him by the GOI through the IMUN,

AFRASIABI has received health insurance benefits through his employment at the IMUN

since at least 2011.  From in or about December 2011 through March 2016, AFRASIABI

received healthcare benefits under the IMUN plan offered by a healthcare insurance provider

("Provider-1").   Provider-1's plan was open exclusively to "full-time employees" of the

IMUN and their dependents.  On or about December 22, 2011, AFRASIABI received an

email from an IMUN employee that, among other things, provided AFRASIABI with a health

insurance identification number and group number for the plan offered by Provider-1.

AFRASIABI's employer was listed in plan documents as "Mission of Iran to U.N."   Other

beneficiaries of Provider-1's plan have included Permanent Representative-1, a different GOI

Permanent Representative to the United Nations ("Permanent Representative-2"), Press

Secretary-1, Press Secretary-2 and other GOI officials assigned to the IMUN.

80.    Subsequently, from in or about April 2016 through July 2020,

AFRASIABI received healthcare benefits under the IMUN-sponsored healthcare plan offered

through another healthcare insurance provider ("Provider-2").   Provider-2's plan was open

exclusively to "regular full-time employee[s] of Permanent Mission of Iran to the UN . . .

working a minimum of 25 hours per week" and their dependents.   Other beneficiaries of

Provider-2's plan included Permanent Representative-1, Press Secretary-1, Press Secretary-2 and other GOI officials assigned to the IMUN.

81.     Between in or about December 2011 and March 2020, the IMUN paid at least $56,000 in insurance premiums to Provider-1 and Provider-2 on behalf of AFRASIABI. Moreover, through approximately March 2020, healthcare providers have billed Provider-1 and Provider-2 at least $84,000 for healthcare services and prescriptions provided to AFRASIABI under their respective plans.

82.     The IMUN canceled the health insurance coverage offered to its employees through Provider-2 and, beginning on July 1, 2020, contracted with a third health insurance provider ("Provider-3") to offer healthcare benefits to its employees.   Health insurance coverage under Provider-3's plan is restricted to "Eligible Employees" of the IMUN, which includes "[a]ll active full-time U.S. Inpatriate, and U.S. National employees."   As of December 22, 2020, AFRASIABI was enrolled as an employee member of the IMUN health benefit plan offered through Provider-3.

    2.   <u>The IMUN Provided the Defendant's Salary and Health Care Benefits To Compensate Him For His Work To Influence The American Public</u>

83.     As detailed above, AFRASIABI conducted his activities on behalf of the GOI and IMUN in coordination with, and under the direction and control of GOI officials and as a paid employee of the IMUN.   Indeed, AFRASIABI himself has admitted that the IMUN's payments have long been his principal source of income.   In or about February 2014, AFRASIABI emailed U.S. Person-2 and stated, in sum and substance, that, due to budget cuts, AFRASIABI had lost what he described as his United Nations consulting position.

AFRASIABI stated "I had this since 2000 was my main source of income and allowed me to survive."

84.     That same day, AFRASIABI directly emailed the Foreign Minister and stated:

> I really didn't expect that under your stewardship I would face the axe.  Really hurts and so sudden and no prior notice and after all the tremendous heat I have taken for my defense of Iran. Where is the sense of appreciation and fairness to someone who has selflessly given it all.   Please see to it that I am not.

85.     Subsequently, on or about February 17, 2014, Permanent Representative-2 informed AFRASIABI that his employment at the IMUN was not being terminated.

86.     To justify his continued employment by the GOI, AFRASIABI has provided IMUN officials with regular updates of the work that he performed on behalf of the GOI.  For example, on or about May 1, 2015, AFRASIABI emailed Press Secretary-2 and Permanent Representative-1 and stated:

> I will continue to fully support our foreign minister as I have in the past.   for your information,last month I wrote:
> 1. Article in Boston Globe
> 2. Letter in Washington Post
> 3. Four articles in Eurasia Review
> 4. Three articles in IRDiplomacy.
> 5. Two articles in Iran Review
> 6. Three interviews in RT
> 7. 11 interviews in PressTV.

AFRASIABI also stated that he had assisted Press Secretary-1 with his "oped that was published in America."

87.     More recently, AFRASIABI has made clear that his extensive corpus of published works and television appearances, in which he has consistently advocated

perspectives and policy positions favored by the GOI, has been entirely attributable to the funding provided by the GOI.  In a series of emails in July 2020 that appear to have been prompted by a decision by the IMUN to terminate his employment, AFRASIABI lobbied senior GOI officials to continue their "support" for his work, pointing to his prolific publications and televised appearances as evidence of his value to the GOI's foreign policy.

88.     On or about July 9, 2020, AFRASIABI emailed the GOI Foreign Minister, writing of his "shock[] to hear bad news from the mission," and urging him to "Please intervene in this matter."  AFRASIABI highlighted his "solid record," including "over a dozen books some 1500 articles and hundreds of tv interviews," and noted that he uses his "health insurance extensively."

89.     On or about July 14, 2020, AFRASIABI emailed the GOI Foreign Minister, writing:

> You sustained critical support for me for the whole duration since so long ago and you know I have been an intellectual pillar for our foreign policy with so many books, articles, and TV interviews, so why allow a rupture that would harm my ability to continue my works? Please read my latest interview with IRDIplomacy I sent link today, latest example of my contributions, or my Asia Times piece on the deal still on top of google search on subject.

90.     On or about July 16, 2020, AFRASIABI sent another email to the Foreign Minister attaching his most recent book proposal, writing "ba salam, attached please see the book contract for our next book that, unfortunately, there is no way I can finish if the support is ended in this horrible pandemic environment.  Please make sure there is no interruption in my works."  In the "affiliation" section of the book proposal, AFRASIABI identified himself only as a "former political science professor at Tehran University," and later,

in a section requesting "Author and contributor information," added "consultant to United Nations."   In the book proposal, AFRASIABI and his co-author, U.S. Person-2, proposed to "[s]urvey[] the tumultuous relationship between Iran and the United States in modern history" and to "provid[e] new insights on how to chart a positive scenario based on the principles of peaceful coexistence and non-intervention."

91.    On or about July 22, 2020, AFRASIABI sent an email to an IMUN official in which he referenced all of his efforts to shape public opinion by writing "a couple of hundred oped pieces . . . Not to mention all the tv interviews," "[d]uring Jcpoa talks," in an apparent reference to the July 2015 agreement on Iran's nuclear program between the GOI, the United States and several other nations known as the Joint Comprehensive Plan of Action ("JCPOA").    AFRASIABI urged him to "please keep in mind all the hardship i ve endured over the years over iran."

92.    On or about July 26, 2020, AFRASIABI sent an email to GOI officials, including Permanent Representative-3, with the subject "My kidney problem/bimeh" to which he attached a photograph of a doctor's comment on a laboratory report.   In the body of the email, AFRASIABI appeared to urge Permanent Representative-3 to continue to pay for his health insurance through the IMUN, writing "Ba salam as you can see from latest regular check up i have some kidney issues requiring follow up.   Without insurance i could not do it and this poses a major health risk to."

93.    On or about July 28, 2020, AFRASIABI sent an email with the subject "my record," to GOI officials, including Permanent Representative-3 and the Foreign Minister, in an apparent effort to justify his continued employment by the GOI.   In his email, AFRASIABI explained:

> ba salam, below are the links for many of my works, including books, hundreds of articles in international newspapers and academic journals. Without support none of this would have been possible! This has been a very productive relationship spanning decades that ought not to be interrupted. After all the hard work and personal sacrifice in today's dire environment, I count on sustained support more than ever before.

In the body of the email that followed, AFRASIABI listed links to dozens of published books and articles, and referenced hundreds of appearances on various television programs. Among others, AFRASIABI provided a link to an April 22, 2020 article published in the Asia Times, in which he interviewed Permanent Representative-3. The article was titled "No pandemic peace for the US and Iran" with the subtitle "[Permanent Representative-3] tells Asia Times the US has flouted the UN's call for a global truce to combat the coronavirus." AFRASIABI also linked to the search page of Lobelog.com showing his published articles, including a May 27, 2019 article titled "The Flimsy U.S. Case Against Masoud Soleimani," in which AFRASIABI criticized the federal prosecution of Masoud Soleimani for sanctions violations, claiming that "Soleimani's predicament sends a strong message of U.S. hostility, not only to the Iranian government but also the Iranian people, who are increasingly suffering under the growing weight of economic sanctions."

94.    Financial records reveal that the IMUN has not terminated its support for AFRASIABI and has continued to pay him a monthly salary of $3,000. Moreover, AFRASIABI continues to be enrolled as a member of the IMUN's employee health insurance plan offered through Provider-3.

E.     The Defendant's Knowledge of His Registration Requirements

95.     At all relevant times, AFRASIABI's agency relationship with the GOI required him to register with the U.S. Department of Justice prior to acting as an agent of that foreign principal.

96.     AFRASIABI's communications demonstrate that he has long been aware of the requirement under FARA to register as an agent of a foreign principal with the U.S. Department of Justice.   For example, on or about May 6, 2011, AFRASIABI emailed an Iran-based individual to discuss the formation of a consulting firm in the United States for the purpose of advising high-ranking officials within the GOI.   The individual replied, "I understand, Kaveh-jan.   Let me think about it –there's also US law to consider and the foreign agent registration, which with Iran won't be granted now, I believe.   But I'll think about it more…."

97.     On or about September 13, 2014, AFRASIABI received an email from U.S. Person-2 attaching an article in the New York Times titled, "Foreign Powers Buy Influence at Think Tanks."   U.S. Person-2 stated, "Also click the original documents listed in this article.   If there was ever any doubt on the propaganda nature of the think tanks, this article should clear some of the doubts."   The article reported that many think tanks that accept donations from foreign governments to engage in political activity do not register with the U.S. Department of Justice under FARA, and thus "policy makers who rely on think tanks are often unaware of the role of foreign governments in funding the research."   The article specifically addressed FARA's requirement that "groups that are paid by foreign governments with the intention of influencing public policy" must register as foreign agents with the U.S. Department of Justice.

98.     On or about February 11, 2016, AFRASIABI emailed Press Secretary-2 and attached an article from the Christian Science Monitor titled, "To counter Iranian rival, Saudi Arabia steps up Washington Lobbying."   In the email, AFRASIABI wrote, "Salam. Expect an avalcnche of anti-Iran bills in the Congress soon (most will violate JCPOA)."   The article discussed, among other things, Saudi Arabia's lobbying effort in the United States. The article described information gleaned from various FARA disclosures made by individuals and entities in the United States lobbying on behalf of the Kingdom of Saudi Arabia.

99.     On or about June 6, 2016, AFRASIABI received an email from U.S. Person-2 attaching an article from the website "Maplight.org" titled, "Top Washington Lobbyist Slow to Discuss Relationship to Saudi Arabia."   The article discussed, among other things, the requirements of FARA and the purpose behind the law.

100.    Furthermore, on or about June 8, 2016, AFRASIABI received an email from U.S. Person-2 attaching an article from the website "LobeLog.com" titled, "Gulf Lobbyist Fails to Disclose Ties to Qatar in Media Appearances."   The article focused on a lobbyist who failed to register under FARA.

101.    On or about November 2, 2018, AFRASIABI received an email from U.S. Person-2 with the subject "Saudi foreign agents' political donations top $1.6 million in 2018 U.S. elections" that linked to an article at the website "OpenSecrets.org" with the same title.   The article relied on and discussed "disclosures to the Department of Justice made in compliance with the Foreign Agents Registration Act (FARA)" to report that "Saudi interests have spent more than $24 million to influence U.S. policy and public opinion during the 2018 election cycle."   AFRASIABI responded "Remember shah did it too."

102.     On or about March 21, 2020, AFRASIABI received an email from U.S. Person-2 with a link to a civil complaint filed in the United States District Court for the Southern District of New York, with the description "Former hostages in Iran and their families are suing Chase Bank for allegedly violating the Foreign Agents Registration Act, or FARA, by acting as an unregistered foreign agent for Iranian Shah /Mohammad Reza Pahlavi/. . . ." The complaint described the statutory requirement for agents of foreign principals to register with the U.S. Department of Justice, and alleged that the banks had unlawfully acted as agents of a foreign principal without registration.   AFRASIABI responded "They waited a long time!"

103.     On or about June 23, 2020, AFRASIABI received an email from U.S. Person-2 with the subject "Another Iran group hires regime change lobbyist | Foreign Lobby" and attaching a PDF of an article from "ForeignLobby.com" with the same title.   The article described information obtained from a FARA filing with the U.S. Department of Justice that disclosed, according to the article, that an "unincorporated collective" identifying itself as the "Iran Transition Council" had hired a lobbying firm "to help "arrange for meetings and activities with government and media toward Iran and the current and future governments of Iran."   The article included a hyperlink to the FARA filing on the fara.gov website where such disclosures are made publicly accessible.

104.     AFRASIABI has never registered with the U.S. Department of Justice as an agent of a foreign principal, as required by Title 22, United States Code, Section 612.

## CONCLUSION AND REQUEST FOR SEALING

105.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, this Complaint and any resulting arrest warrant.   Premature

37

disclosure of the contents of this Complaint and the arrest warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, and notify confederates.   Some of the evidence in this investigation is stored electronically and can be completely and permanently erased.   Some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process).   If alerted to the existence of the arrest warrant, there is reason to believe that the subjects under investigation will destroy that evidence and change their patterns of behavior.

WHEREFORE, your deponent respectfully requests that an arrest warrant issue so that the defendant KAVEH LOTFOLAH AFRASIABI, also known as "Lotfolah Kaveh Afrasiabi," may be dealt with according to law.

TYLER B. WASILITION
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable telephonic and electronic means
pursuant to Federal Rule of Criminal Procedure 4.1, this
15th day of January, 2021

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK